Filed 6/26/13  P. v. Cotton CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B235980 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA059248) |
| v. | |
| WESLEY STANLEY COTTON, | |
| Defendant and Appellant. | |
| In re | |
| WESLEY STANLEY COTTON, | B242501 |
| on | |
| Habeas Corpus. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Clifford L. Klein, Judge.  Affirmed.

PETITION for Writ of Habeas Corpus.  Writ denied.

Winston Kevin McKesson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Wesley Stanley Cotton, appeals his conviction, by no contest plea, for rape and forcible sodomy, with an enhancement for aggravating circumstances (during commission of a burglary; multiple victims; tying and binding) (Pen. Code, §§ 261, subd. (a)(2), 286, subd. (c)(2), 667.61, subd. (b)).[1] Cotton has also filed an accompanying habeas corpus petition. He was sentenced to state prison for 28 years to life.

The judgment is affirmed; the habeas corpus petition is denied.

## BACKGROUND

On June 22, 1998, Cotton pled no contest in Los Angeles County Superior Court case number PA030361[2] to having committed a series of felony offenses against multiple victims. Those offenses included: four counts of attempted rape committed against four different victims; one count of rape with use of a deadly weapon committed against a fifth victim; and, five counts of robbery committed against a sixth victim and against four of the five sexual assault victims. Pursuant to a negotiated plea bargain, Cotton was sentenced to a prison term of 25 years.

On September 24, 2008, an information was filed in Los Angeles County Superior Court case number PA059248, charging Cotton with having sexually assaulted two additional victims around the same time he committed the 1998 crimes to which he pled no contest. Cotton was now charged with having committed rape and forcible oral copulation against Sheila C., and forcible sodomy against Linda R.

As to Sheila C., the information pled an extension of the statute of limitations under section 803, subdivision (g),[3] alleging "the crimes of forcible oral copulation

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     Another Los Angeles County Superior Court case, number PA030410, was consolidated with case PA030361.

[3]     Section 803, subdivision (g)(1) provides, in pertinent part: "Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date on which the identity of the suspect is conclusively established by DNA testing, if both of the following conditions are met: [¶]  (A) The

2

and forcible rape were committed on 03/16/98, . . . the biological evidence collected in connection with the offense was analyzed for DNA type on 10/26/99, and . . . identity was established by DNA testing on 08/07/06." As to Linda R., the information pled the same statute of limitations extension, alleging the crime had been "committed on 03/25/98, and the biological evidence collected in connection with the offense was analyzed for DNA type on 10/26/99, and . . . identity was established by DNA testing on 08/17/06."

Cotton moved to dismiss these new charges. One of his claims was that the new charges were barred because the 1998 plea bargain agreement had been intended to resolve the crimes against *all* of his victims, including Sheila C. and Linda R.

On April 30, 2010, the trial court took testimony from Susan Mills, the deputy district attorney who negotiated the 1998 plea bargain agreement. The trial court also examined the reporter's transcript from the 1998 proceeding at which Cotton entered his no contest plea. That transcript included the following colloquy:

"[Defense counsel]: Your Honor, just for the record, could I indicate we have spent some time going over everything that's been alleged, and I have advised Mr. Cotton based on the circumstances, the police reports and the charges that have been filed at this point, there was also the possibility of additional charges being filed based on my review of the facts and my discussions with the district attorney's office, and certainly that was a fact they took into consideration in this decision.

"The Court: *The bargain is no additional charges will be filed*?

"[Defense counsel]: *Yes, as relates to any of these crimes*.

"Ms. Mills: *That's right*." (Italics added.)

---

crime is one that is described in subdivision (c) of Section 290. [¶] (B) The offense was committed prior to January 1, 2001, and biological evidence collected in connection with the offense is analyzed for DNA type no later than January 1, 2004 . . . ." The felony complaint charging the offenses against Sheila C. and Linda R. was filed on June 1, 2007.

3

At the hearing in 2010, Mills testified she had reviewed the 1998 transcript:

"Q. And with regard to that, were there potentially additional charges that you were considering adding as to the victims named in the complaint on your case?

"A. Yes. Based on my review of the D.A. file and notes that I had contained in the D.A. file, I was intending to add kidnapping charges to the . . . victims named in the original complaint after the preliminary hearing.

"Q. And as part of the disposition, then, was it contemplated that you would not add additional charges *as to those victims named in the complaint in your case*?

"A. Correct. I . . . would never say I'm not going to ever file charges against other potential victims that might be out there." (Italics added.)

Mills also testified: "[M]y understanding from reading the file, it really wasn't clear back in that time period whether or not [Cotton] was connected [to the alleged crimes against Sheila C. or Linda R.]. Other people had in fact disclaimed his involvement and not been able to identify him . . . ." Mills asserted that if the plea agreement had been intended to cover "other victims, it would have been specifically spelled out in the plea. It would not be open to speculation as to what exactly was meant by 'these.' "

Mills was questioned by the trial court:

"A. My interpretation of 'these crimes' means the crimes involving the victims named in the complaint, not any potential other possible crimes that the defendant may have at some other point committed.

"Q. Now, did you say earlier as a general statement that you would not have been contemplating resolving potential charges involving other victims not mentioned in that charging document. Is that right?

"A. That's correct, Your Honor.

"Q. You want to explain what you mean by that?

"A. It's just beyond my comprehension that I could possibly think about stating that I would never, ever file any other possible charges against a defendant, because it could be the next day I find out that he committed murder and I'm going to be barred

4

from charging that. I just would not do something like that. If I were going to exclude the filing of additional charges regarding other victims, it would be specifically spelled out in the plea agreement."

Mills testified that at the time of the plea agreement, Cotton had not been definitively connected to any victims or crimes other than the ones named in the 1998 complaint.

After hearing this testimony, the trial court denied Cotton's motion to dismiss the new charges. On June 27, 2011, Cotton pled no contest to one count of rape against Sheila C. and one count of forcible sodomy against Linda R.

## CONTENTIONS

1. The charges for sexually assaulting Sheila C. and Linda R. violated the terms of Cotton's 1998 plea bargain agreement.

2. The new prosecution should have been dismissed for pre-charging delay.

## DISCUSSION

1. *The new prosecution was not barred by the 1998 plea bargain.*

Cotton contends he could not be prosecuted for assaulting Sheila C. and Linda R. because those crimes were covered by the 1998 plea bargain agreement. This claim is meritless.

a. *Proceedings below*.

In the trial court, Cotton argued the true meaning of the 1998 plea bargain agreement could be gleaned from this exchange during the proceedings leading up to his original no contest plea:

"The Court: The bargain is no additional charges will be filed?

"[Defense counsel]: Yes, as relates to any of *these crimes*." (Italics added.)

Cotton asserted the reference to "these crimes" demonstrates the parties intended the agreement to encompass all the crimes arising out of his 1998 crime spree. The trial court disagreed, concluding that could not have been the parties' intention because, in 1998, the crimes against Sheila C. and Linda R. were still being investigated.

5

As the trial court explained: "[I]t appears from the transcript of June 22nd of 1998 that there's no indication that the attorneys were contemplating at that time that all outstanding potential victims, including the two that are here before me in this current case, would have been settled by way of that plea. . . . [¶] . . . [¶] . . . Sheila C. and Linda R. were in the middle of their investigative phases at . . . the time of that plea. They had no strong evidence that Mr. Cotton was the perpetrator of those crimes. . . . And so I would say that the investigation of those two victims was not in any sort of filing stage for a prosecution, let alone for a D.A. to contemplate folding those two victims . . . into a complaint which was an 18-count complaint to begin with, for the purpose of settling these two victims as part of that plea. It just doesn't make sense to me. In fact, there are statements within the transcript that advise me otherwise."

As for the reference to "these crimes" during the plea-taking hearing, the trial court concluded this had been intended to refer to "the 18 counts that were currently in that complaint at the time. [¶] And that is corroborated by Ms. Mills, who testified here . . . and provided her declaration. So on that score, I don't believe that there's a strong argument to be made that there was . . . an expectation that those two victims would have been resolved by way of that plea."

       b. *Legal principles.*

"When a guilty plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement. . . . [¶] ' "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." [Citation.]' " (*People v. Walker* (1991) 54 Cal.3d 1013, 1024, disapproved on other grounds in *People v. Villalobos* (2012) 54 Cal.4th 177.) "Not all terms of a plea bargain have to be express; plea bargains may contain implied terms." (*People v. Arata* (2007) 151 Cal.App.4th 778, 787.)

"A negotiated plea agreement is a form of contract, and it is interpreted according to general contract principles. [Citations.] 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.) On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." [Citations.]' [Citation.] 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]' " (*People v. Shelton* (2006) 37 Cal.4th 759, 767.)

"[T]he interpretation of contract provisions is . . . a legal issue subject to de novo review, unless the contract is ambiguous and its interpretation turns upon the credibility of witnesses or the resolution of factual disputes. [Citation.] If, however, the essential facts necessary to interpret the contract are not in dispute, but give rise to conflicting inferences, we are not bound to follow the trial court's decision, and may independently draw our own inferences. [Citation.]" (*Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 284-285.)

c. *Discussion*.

Cotton contends it had been his "understanding, and rightly so, that his 1998 [plea bargain agreement] was a bar to prosecution for the other crimes under investigation for which he was a suspect." He argues the Sheila C. and Linda R. matters were no longer at the investigative stage by the time he pled no contest in 1998 because he was already the chief suspect. But this argument ignores the fact neither Sheila C. nor Linda R. had been able to positively identify Cotton when shown a six-

7

pack photo array containing his picture,[4] despite the fact each victim had encountered an unmasked assailant and conversed with him during the crime. Moreover, a review of the 1998 trial court case files showed they did not contain the police reports relating to the attacks on Linda R. and Sheila C.,[5] which tended to demonstrate those crimes were not being lumped together with the offenses included in the 1998 plea bargain agreement.

We conclude the record provides no support for Cotton's assertion he reasonably believed the 1998 plea bargain agreement covered his crimes against Sheila C. and Linda R. The "these crimes" language on which Cotton pins his claim does not appear necessarily ambiguous when read in context, nor does it make sense the prosecutor would have been willing to forego unknown additional charges involving *different victims* as part of the plea bargain. Thus, on the face of the transcript it appears the parties had no intention of referring to the crimes against Sheila C. and Linda R. when discussing the terms of the 1998 plea bargain. In

---

[4]    A prosecutor told the trial court that Sheila C. could not identify Cotton in the photo array, and that Linda R. circled Cotton's picture and said, "He looks most like the person." But the prosecutor added: "So it was a tentative identification. However, when shown other six-packs, she also pointed to three additional people and stated that those also looked like the person who attacked her. So the record should be very clear that her identification was less than tentative."

[5]    This review was done during the 2010 proceedings where the following colloquy occurred: "The Court: . . . Part of the continuances in this case were to find the original court files for these older cases for the purpose of seeing whether or not the police reports relating to the two victims in our current case were in those files. And so we had those files brought to court; and as I take it from argument at this point or the representations, you've both reviewed the two files . . . [in] case No. PA030361 and case No. PA030410. And in neither of these files were there the police reports that you've marked as defense exhibit C. [¶] Is that correct? [¶] [Defense counsel]: That's correct, Your Honor." Defense counsel had apparently been told that Cotton's wife retrieved those police reports from the 1998 trial court files, but counsel acknowledged there was no evidence to substantiate this claim. The trial court then excluded the police reports from evidence.

8

addition, as the trial court found, Deputy District Attorney Mills's testimony confirmed the logic of this conclusion.

Hence, we agree with the trial court that the criminal charges filed against Cotton for having sexually assaulted Sheila C. and Linda R. were not barred by his 1998 plea bargain.

2. *Claim of pre-charging delay was properly denied.*

Cotton contends this prosecution should have been dismissed because pre-charging delay violated his due process rights. This claim is meritless.

a. *Background.*

In considering Cotton's motion to dismiss the prosecution for pre-charging delay, the trial court took testimony from Jennifer Francis, a criminalist with the Los Angeles Police Department. Francis testified that in December 2005, a detective asked to have the DNA sample from Linda R.'s case retested using STR analysis and uploaded to the CODIS system. Francis testified this was done and that the sample was then matched to Cotton. The following month, the detective asked to have Sheila C.'s DNA typing retested using STR analysis and compared with Cotton's DNA profile. This was done and a match identifying Cotton was confirmed.[6]

Francis also testified that, in 1998, rape kit evidence would have been analyzed by a method known as DQ Alpha Poly Marker genetic testing, a more rudimentary type of DNA analysis than is currently used. The modern CODIS database system,[7]

---

[6] It thus appears the original information filed in this case may have these dates reversed, because it alleges Cotton was identified as the Linda R. perpetrator *after* being identified as the Sheila C. perpetrator.

[7] CODIS refers to the FBI's Combined DNA Index System. Section 295, subdivision (g), provides: "The Department of Justice, through its DNA Laboratory, shall be responsible for the management and administration of the state's DNA and Forensic Identification Database and Data Bank Program and for liaison with the Federal Bureau of Investigation (FBI) regarding the state's participation in a national or international DNA database and data bank program such as the FBI's Combined DNA Index System (CODIS) that allows the storage and exchange of DNA records submitted by state and local forensic DNA laboratories nationwide."

which is used to generate DNA cold case matches, operates with a different type of DNA analysis, a method called STR. Francis testified the DQ Alpha Poly Marker evidence in this case could not have been processed by the DNA databank in 1998:

"Q. With respect to having any forensic evidence in this case uploaded into a database, could the rape kits or the evidence included in the rape kits been uploaded into CODIS on these two victims back in 1998?

"A. No.

"Q. Why?

"A. My understanding is the actual type of DNA [? analysis] at the time, the database for CODIS took STR's. It did not take DQ Alpha. That's my understanding."

The trial court subsequently rejected Cotton's claim of pre-charging delay after "balancing an absence of a showing of prejudice with the justification for these delays." The court reasoned:

"[W]hat I'm seeing here is, though there is some level of inactivity in acting on certain leads, for example, some DNA leads, such as getting a court order to take Mr. Cotton's blood, which was not followed up on for some reason, I'm also looking at the technology at the time, which is something you have to consider as you compare it to today's framework. Today you can literally put a person's DNA into a CODIS databank and get hits relatively quickly. . . . Back in 1998 it was a virtual infant in this regard. In fact, the technology to upload information was so primitive that . . . the L.A.P.D. itself was not in a position to even conduct their own analyses. They sent them out to private labs, which was Cellmark at the time; and Cellmark was using Poly Markers and DQ Alpha . . . . And those were not even uploadable into the database as they are today with the STR's and so on. It was just a whole different world back then.

"They didn't have a clear picture of who committed these rapes. At the time, Mr. Cotton was one of more than one suspect. I think the argument was made that he was not the chief suspect. I don't know if that's the case or not, but it appeared from

10

the information that was provided in this hearing that he was one of more than one suspect.

"And so, the People's case at that time as to these two particular victims was firmly in an investigative posture at the time of the pleas in this case and continued to be until the DNA technology evolved to a point where they were able to get these cold hits that are what bring this case back to us today."

b. *Legal principles.*

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the commission of a crime and the defendant's arrest and charging. [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 430.)

"[T]he right of due process . . . safeguard[s] a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence [citation]. [¶] A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time. [Citation.] Prejudice to a defendant from precharging delay is not presumed. [Citations.] In addition, although 'under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process. . . . If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation.' [Citation.] If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. [Citation.] But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified. [Citations.]" (*People v. Abel* (2012) 53 Cal.4th 891, 908-909, fn. omitted.)

11

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]." (*People v. Cowan, supra,* 50 Cal.4th at p. 431.) "Prejudice is a factual question to be determined by the trial court. [Citation.]" (*People v. Hill* (1984) 37 Cal.3d 491, 499.)

As *United States v. Lovasco* (1977) 431 U.S. 783 [97 S.Ct. 2044], one of the seminal cases analyzing pre-charging delay, explained: "It might be argued that once the Government has assembled sufficient evidence to prove guilt beyond a reasonable doubt, it should be constitutionally required to file charges promptly, even if its investigation of the entire criminal transaction is not complete. Adopting such a rule, however, would have many of the same consequences as adopting a rule requiring immediate prosecution upon probable cause." (*Id*. at p. 792.) Such a rule would "cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act," "pressure prosecutors into resolving doubtful cases in favor of early -- and possibly unwarranted -- prosecutions," (*id.* at p. 793) and "preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases." (*Id*. at p. 794.) "In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused,' [citation], precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed,' [citation]. This the Due Process Clause does not require. *We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time*." (*Id.* at p. 795-796, fn. omitted, italics added.)

12

c. *Discussion.*

Cotton contends this prosecution should have been dismissed because he was prejudiced by a nine-year delay that had no legitimate justification. We cannot agree.

Cotton argues he was prejudiced because, without the delay, he would have been able to resolve these charges as part of the 1998 plea bargain agreement, thereby reaping a sentencing benefit: "[I]n 1998, [Cotton] agreed to plead guilty to the charges in an attempt to take care of all outstanding cases and serve a consolidated sentence, with some charges meriting concurrent, rather than consecutive sentences. . . . He agreed to a substantial period of incarceration (25 years) believing when he served his sentence he would have 'paid his debt to society.' " "The prosecution plea bargained in that case, and there is no reason to believe they would not have bargained these three counts as well. Moreover, the defendant could have gotten concurrent or stayed sentences from the court."

These arguments are not persuasive. Cotton's sentencing-benefit claim is purely speculative, and we have already concluded (see Discussion section 1, *ante*) he could not have reasonably believed the 1998 plea bargain covered the crimes he committed against Sheila C. and Linda R.

Cotton also argues the delay caused witness unavailability, the loss of physical evidence, and memory lapses. He asserts, "It is likely that the people who preserved evidence (prints, DNA materials, etc.) are no longer available to testify. Scientific samples have degraded over the years. Witnesses as to this defendant's whereabouts on the days in question are gone from his memory. After all this time . . . the defendant does not know where he was or what he was doing or who he was with on the day Linda R. and Sheila C. were raped."

But Cotton fails to specify what particular physical evidence has been damaged, or which particular witnesses are now unavailable. (See, e.g., *People v. Cowan, supra,* 50 Cal.4th at pp. 431-435 [multiple specified witnesses alleged to have lost memories; specified physical evidence alleged to have been lost or destroyed]; *People v. Catlin* (2001) 26 Cal.4th 81, 108 [two named witnesses died before trial; specific records

13

allegedly lost; specific evidence allegedly destroyed].) Hence, Cotton's entirely abstract assertions, i.e., "it is likely witnesses will be unavailable," do not demonstrate prejudice. As for Cotton's claim of personal memory loss, it is so vague as to be nearly weightless; his " 'bare statement' of inability to recall 'realistically cannot be considered more than minimal prejudice.' " (*People v. Cowan, supra,* 50 Cal.4th at p. 432.)

Regarding justification for the delay, the trial court properly concluded Cotton's identity as the perpetrator of the assaults against Sheila C. and Linda R. had not been firmly established until 2006 when the DNA cold hit match was made. Before that time, Cotton had just been one of several possible suspects and neither victim had been able to positively identify him from a photo array.

We might question the trial court's apparent conclusion the delay was essentially due to the 1998 limitations in forensic science, i.e., the inability to upload the rape kit DNA into the CODIS system until years later. Cotton argues a DNA match could have been made in 1998 if the rape kit evidence had been directly compared to a sample of his blood. But this does not help Cotton's claim of pre-charging delay; a failure to immediately follow up on the blood sample investigation is precisely the kind of discretionary choice the courts have left to the police and prosecutors.

As our Supreme Court has explained in *People v. Nelson* (2008) 43 Cal.4th 1242: "Defendant argues that the DNA technology used here existed years before law enforcement agencies made the comparison in this case and that, therefore, the comparison could have, and should have, been made sooner than it actually was. Thus, he argues, the state's failure to make the comparison until 2002 was negligent. We disagree. *A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case.* '[T]he necessity of allocating prosecutorial resources may cause delays valid under the *Lovasco* analysis. [Citation.] Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a

14

valid justification for delay . . . .' [Citation.] *It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner.*" (*Id*. at pp. 1256-1257, italics added.)

Finally, Cotton implies there was an improper, non-investigative reason for the delay by asserting: "It was no accident that the cases are brought now, as the defendant's prison sentence is expiring." But even if true, this would not mean the People intended ever since 1998 to hold this prosecution in reserve just to be able to extend Cotton's time in prison. In any event, Cotton's suggestion is not supported by any evidence and remains entirely speculative. It cannot overcome the substantial evidence showing that what occurred here was simply an investigative delay because, in 1998, it was not entirely clear Cotton was the perpetrator.

We agree with the Attorney General that, at most, Cotton has presented only a weak showing of prejudice which is easily outweighed by justifiable investigative delay. "*[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.*" (*United States v. Lovasco, supra,* 431 U.S. at p. 796, italics added.) Therefore, we conclude the trial court did not abuse its discretion by refusing to dismiss this case for pre-charging delay. (See *People v. Cowan, supra,* 50 Cal.4th at p. 431.)[8]

---

[8] Given our conclusions, we also deny Cotton's habeas corpus petition.

15

## DISPOSITION

The judgment is affirmed.  The petition for writ of habeas corpus is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:



KITCHING, J.



ALDRICH, J.


16