Filed 8/22/16  P. v. Bovensiep CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THOMAS DANIEL BOVENSIEP,<br><br>    Defendant and Appellant. | D068198<br><br><br>(Super. Ct. No. SCD246266) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Thomas Daniel Bovensiep guilty of 13 counts of grand theft (Pen. Code, § 487, subd. (a)), and two counts of securities fraud (Corp. Code, §§ 25401, 25540).  The jury also found true certain special allegations or enhancements.  Bovensiep

received a total prison term of nine years four months. Bovensiep challenges his convictions, contending the trial court violated his rights to a speedy trial and due process. He also asserts that the statute of limitations barred ten of the grand theft counts and the two securities fraud counts. We disagree with Bovensiep's assertions and affirm the judgment.

GENERAL FACTUAL BACKGROUND

Because the parties are familiar with the facts, we summarize only the general facts concerning the underlying crimes at issue in this appeal. We present additional facts concerning the speedy trial and statute of limitation issues in our discussion below.

**Ronald Dixon – Count 1**

In 2003, Bovensiep persuaded his pastor, Craig Knudsen, and Steven Zoumaras, a business acquaintance, to purchase shares in a limited liability company (LLC) for the purpose of purchasing a condominium located in Hawaii (the 835 property). Unbeknownst to the partners, Bovensiep listed his brother-in-law, John Oakes, as the owner telling Oakes that he wanted to use Oakes's good credit. Bovensiep told Oakes, who was not in on the scheme, that he would put the loan in the LLC's name, removing Oakes, as soon as Bovensiep refinanced the property. Bovensiep secretly refinanced the 835 property and took out a line of credit of over $114,000, but left Oakes listed as the owner of the property.

Dixon, who had met Bovensiep through Oakes and his church, bought Zoumaras's interest in the 835 property for a total of $117,578 in June 2005. On Thanksgiving Day 2009, Dixon learned that the 835 property was being foreclosed.

2

**The Kneeshaws – Count 7**

George Kneeshaw and his wife, Terry, have known Bovensiep for over 35 years. George and Bovensiep had worked as deputy sheriffs together and they remained friends. In September 2007, the Kneeshaws, along with other individuals each invested about $60,000 toward the purchase of a condominium in Kihei, Maui (the Kihei property). Bovensiep managed the Kihei property. On December 5, 2009, the Kneeshaws learned that the Kihei property was facing foreclosure. At the end of December 2009, George reported the matter to the sheriff's department for a potential criminal investigation.

**The Kneeshaws – Counts 5, 8-11**

Bovensiep convinced the Kneeshaws to make a series of four separate loan investments, supposedly to people in need. The Kneeshaws were to receive monthly interest and a return of their principal after a specified time. Bovensiep made some interest payments, but never repaid the principal. Bovensiep later admitted to Trudianne Bullard, an investigator for the district attorney's office (DA), that he used the money himself to keep his scheme afloat.

**Frederick Semeit – Count 12**

Semeit, the Kneeshaws' son-in-law, believed he could trust Bovensiep as Bovensiep seemed like a really nice guy. Semeit purchased two homes using Bovensiep's services and also obtained a $5000 loan from Bovensiep, which Semeit repaid. After Semeit divorced, he gave Bovensiep a $10,000 down payment in February 2008 for a house. When the purchase allegedly fell through, Semeit gave Bovensiep another $15,000 and let Bovensiep keep his initial $10,000 with the understanding that

3

Bovensiep would pay Semeit interest on the money and the debt would mature in November 2008. Semeit gave Bovensiep another $20,000, with a maturity date in October 2008. Semeit believed Bovensiep would be loaning the funds to a third party. Bovensiep never repaid Semeit.

**Chris Miller – Count 13**

In April 2008, Miller, a church friend of Bovensiep, gave Bovensiep a $48,000 down payment to purchase a condominium for Bovensiep to manage. Bovensiep eventually told Miller that escrow on the property had been cancelled and he would give Miller his money back. Bovensiep never paid Miller back. Bovensiep admitted to Bullard that when he got money from Miller, he used it to pay someone else who had loaned him money and "lied" to Miller about where Miller's money was going.

**Robert Stevens – Count 18**

Karen Taylor's husband had invested money with Bovensiep and spoke very highly of Bovensiep. Taylor believed Bovensiep took the money to extend loans to third parties. Taylor referred two of her sisters, Laura Colling and Marsha Allen, and her best friend Diane Mullins to Bovensiep. Allen in turn referred her friend Patricia Osborne to Bovensiep. Mullins referred Stevens, her father, to Bovensiep.

In January 2007, Stevens invested $25,000 with Bovensiep and was to receive monthly interest and return of his principal after a specified time. Bovensiep never paid Stevens back. Bovensiep later admitted to Bullard that he led Stevens and others to believe the loans were for third parties, but that he used the money to keep his other schemes afloat.

DISCUSSION

I. *Rights to Due Process and a Speedy Trial*

Bovensiep complains about prosecutorial delay in charging him. Delay in charging a defendant after commission of an alleged crime (pre-charging delay) does not implicate speedy trial rights. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) The federal right to a speedy trial attaches only after an arrest or the filing of an indictment or information, although California extends the right by holding that it attaches after a complaint has been filed. (*United States v. Marion* (1971) 404 U.S. 307, 320; *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1327.)

Here, Bovensiep sought to dismiss the charges against him based on alleged delays in charging him. Bovensiep never sought a dismissal based on post-charging delay. Notably, the record shows that after charges were filed, Bovensiep requested numerous continuances of the preliminary hearing and three trial continuances. Under these facts, Bovensiep waived his right to a speedy trial. (*People v. Wilson* (1963) 60 Cal.2d 139, 146 [the constitutional or statutory right to a speedy trial may be waived if not asserted prior to commencement of trial].) Accordingly, we focus on Bovensiep's claim of pre-charging delay.

A. Additional Background

Before trial, Bovensiep sought to dismiss the case based on violation of his rights to due process and speedy trial, claiming the delay resulted in the loss of bank documents destroyed in the normal course of business and the loss of all records he kept in a storage facility. The trial court deferred consideration of the motion until after trial, so as to

5

better assess any resulting prejudice to Bovensiep. Following trial, Bovensiep again moved to dismiss the action based on the alleged constitutional violations. The trial court denied the motion. The court noted that by the People's own admission, the case had "sat around" from April or May 2010 to October 2010. Nonetheless, it concluded this unjustified delay did not result in any prejudice as this delay did not cause the missing documents. The trial court found that the great age of the case was primarily attributable to how long it took the victims to discover Bovensiep's possible criminal activities and bring him to the attention of law enforcement.

B. Legal Principles

California's due process clause states, in part, that "[p]ersons may not . . . be deprived of life, liberty, or property without due process of law." (Cal. Const., art. I, § 15.) Pre-charging delay is analyzed as a due process claim. (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 505.) "The due process clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Rather, the task of the reviewing court is to determine whether pre-charging delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency. Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." (*People v. Dunn–Gonzalez* (1996) 47 Cal.App.4th 899, 914.) "[T]o prosecute a defendant following investigative delay does not deprive the

6

defendant of due process, even if his or her defense might have been somewhat prejudiced by the lapse of time." (*Id.* at p. 915.)

We employ a three-part test to determine if a defendant's due process right to a fair trial has been violated because of pre-charging delay: "(1) the defendant must show that he has been prejudiced by the delay, whereupon (2) the burden shifts to the People to justify the delay, and (3) the court balances the harm against the justification." (*People v. Pellegrino* (1978) 86 Cal.App.3d 776, 779.)  Prejudice from pre-arrest delay is not presumed. (*Nelson*, *supra*, 43 Cal.4th at p. 1250.)  To avoid criminal charges on this basis, the defendant "must affirmatively show prejudice." (*Ibid.*; *People v. Martinez* (2000) 22 Cal.4th 750, 767.)

"[W]hether the delay was negligent or purposeful is relevant to the balancing process.  Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation.  If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson*, *supra*, 43 Cal.4th at p. 1256.)  We review the trial court's ruling on a motion to dismiss for prejudicial pre-charging delay for abuse of discretion, deferring to any underlying factual findings supported by substantial evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 431.)  Whether a defendant met the initial burden of showing prejudice is a factual question for the trial court. (*People v. Hill* (1984) 37 Cal.3d 491, 499.)

7

C.  Analysis

Bovensiep was unable to provide records regarding his bank account prior to December 21, 2007, because these documents had been destroyed by his bank in the normal court of business.  Bovensiep kept his internal financial and accounting records in a storage facility.  All of these records were destroyed in September 2013 when a storage unit he had leased was seized for nonpayment.  Bovensiep argued below that the bank records and the records in the storage facility would have shown he used the victim's funds in the normal course of his real estate business, and that he told some of the victims that he took their money not to lend to third parties, but to keep his businesses afloat.

The prosecution learned that Bovensiep may have committed a crime on December 30, 2009, when George Kneeshaw filed a report with the sheriff's department. It is unclear when the sheriff's department referred the matter to the DA.  The prosecutor represented to the court that the DA received the case in April 2010.  However, the People's opposition papers and a timeline prepared by Bullard indicate the DA received the matter in February 2010.

In May 2010, a deputy district attorney contacted George Kneeshaw about the matter.  Thereafter, there was about a four-month delay until the DA referred the matter to Bullard in October 2010.  The prosecutor speculated that the unavailability of an investigator caused this delay, but presented no evidence on the issue.  On this basis alone, the trial court properly found this four-month delay unjustified.  The trial court concluded, however, that this unjustified delay did not cause the missing documents;

8

thus, Bovensiep was not prejudiced by the delay. Substantial evidence supports this conclusion.

Records from the storage facility show Bovensiep habitually failed to timely pay the rental fee from June 2008 until the time the storage facility notified him in March 2013, that the stored property would be sold. The documents in the storage facility went to auction in August 2013, but were not actually destroyed until September 2013. Notes from the storage facility show that Bovensiep intentionally allowed the contents of the unit go to auction. Bovensiep was arrested on January 29, 2013, and interviewed the following day. Accordingly, Bovensiep had adequate time to inform the prosecution of the importance of these documents before the storage facility had them destroyed. The trial court correctly found that any pre-charging delay did not result in the destruction of the storage facility documents. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 432 [a suspect who, knowing of police interest, fails to preserve alibi evidence in his control, cannot complain that a delay in charging violated his due process rights].)

The parties stipulated that Bovensiep's bank retained its records for seven calendar years, that the bank destroyed the records on a rolling basis, and that the missing bank records had been destroyed in the normal course of bank business. As a result, Bovensiep was unable to provide records regarding his bank account prior to December 21, 2007. Thus, the unjustified four-month delay in getting the case assigned to an investigator resulted in the loss of a portion of the bank records.

9

As the trial court noted, however, records showing how Bovensiep spent the money was not the critical inquiry because "[a]t a point it becomes theft when you're taking money from someone knowing you can't pay it back." Bovensiep admitted to Bullard that he took about $55,000 from the 835 property as loans for himself or his business that he never repaid. Bovensiep also admitted taking money from certain victims telling them the funds would be used as loans to needy third parties, but that he used these funds to keep the condominiums afloat. Bovensiep stated that things started to "snowball[]" as he was borrowing from one individual to pay another. Bovensiep conceded that when the victims confronted him about the money, he lied to them with false stories because he had already spent the money to keep everything afloat.

The trial court instructed the jury on theft by false pretenses and theft by embezzlement, and told the jurors that they were not required to agree on the same theory to find Bovensiep guilty. Bovensiep's statements to Bullard supported an inference that he took some of the money (1) knowing he would not be able to repay it, supporting theft by embezzlement, or (2) based on false representations that he would be loaning the money to needy people, supporting theft by false pretense. (See CALCRIM Nos. 1804, 1806.) Accordingly, the record supports the trial court's finding that Bovensiep did not suffer actual prejudice.[1]

_____

[1] Bovensiep also contends the bank records were relevant to his defense that the investment losses suffered by the victims were the result of the financial downturn of the economy, rather than any misappropriation he may have committed. While it is probably true that the economic downturn caused the real property investments to lose value, we fail to see how the bank records would have proven this fact.

Finally, a prosecutor is entitled to take a reasonable amount of time to investigate an offense to determine whether prosecution is warranted or to gather more evidence to build a case against the defendant. (*People v. Dunn-Gonzalez*, *supra*, 47 Cal.App.4th at p. 911.) "[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." (*United States v. Lovasco* (1977) 431 U.S. 783, 796.)

Here, Bullard prepared a detailed timeline showing an active investigation of the matter. After Bullard received the matter she immediately started interviewing witnesses and securing documents. In 2010, Bullard asked for assistance from Steven Papet, an investigative auditor with the California Department of Justice, because she knew the matter was going to be "document heavy." In July 2011, Bullard e-mailed Papet that the DA was ready to file as soon as he finished his analysis. However, the investigation then led to the discovery of additional victims. In June 2012, Bullard learned that Collings and Taylor might be victims. Through that interview Bullard learned about Stevens and Allen and interviewed them in July 2012. Thus, the DA was discovering additional victims six months before it filed charges against Bovensiep.

The evidence supports the trial court's conclusion that once the DA assigned the matter to Bullard, the time required to investigate justified any delay in charging Bovensiep. Even assuming the loss of bank records during the investigation of the case prejudiced Bovensiep, the justifiable investigative delay outweighed Bovensiep's showing of prejudice. Thus, we conclude the trial court did not abuse its discretion in refusing to dismiss the charges against Bovensiep based on pre-charging delay.

11

## II. *Statute of Limitations Defense*

A. Additional Background

Before trial, the court denied Bovensiep's motion to dismiss some of the charges on statute of limitations grounds. The court explained that Bovensiep's position of trust and reasonable excuses allowed him to get away with his crimes longer as the victims believed Bovensiep's assurances that he would pay them back. The trial court held that the position of trust that Bovensiep had with the victims created triable issue of fact for the jury.

The parties agreed that each of the grand theft and securities fraud counts were subject to a four-year statute of limitations, which accrued upon discovery, and that the prosecution of the action began on February 13, 2013, when the original information was filed. The parties argued the statute of limitations issue to the jury. The trial court instructed the jury that the People began the prosecution of the case on February 13, 2013, and for the prosecution to be timely the jury needed to find that the People prosecuted the crimes within four years of the date the victims discovered or should have discovered Bovensiep's criminal actions.

Thus, to be timely, the jury needed to find that the events giving rise to the vast majority of the counts could not have been legally discovered before February 13, 2009, four years prior to the filing of the original information. In finding Bovensiep guilty, the jury necessarily concluded that the statute of limitations did not bar the 10 counts at issue.

B.  Legal Principles

A defendant may raise a statute of limitations claim in a pretrial motion, but the trial court may decide the issue as a matter of law only if the facts are undisputed. (*People v. Le* (2000) 82 Cal.App.4th 1352, 1361.)  A pretrial motion to dismiss on the ground the statute of limitations has run "is the functional equivalent of a motion for summary judgment in the civil context."  (*People v. Lopez* (1997) 52 Cal.App.4th 233, 251 (*Lopez*).)  The court should grant the motion only if the evidence establishes as a matter of law that the statute has run.  (*Id.* at p. 250.)  If the People prevail on the motion, then the jury must resolve the limitation issue if it remains disputed by the defendant. (*People v. Zamora* (1976) 18 Cal.3d 538, 563-564, fn. 25 (*Zamora*).)

"[T]he statute of limitations is not an ingredient of an offense but a substantive matter for which the prosecution's burden of proof is a preponderance of the evidence." (*People v. Riskin* (2006) 143 Cal.App.4th 234, 241.)  "Under the preponderance of evidence standard, the prosecution is entitled to prevail at trial even if the evidence is conflicting (and thus does not establish the point as a matter of law) if the fact finder believes the prosecution's evidence and that finding is supported by substantial evidence." (*Lopez*, *supra*, 52 Cal.App.4th at p. 250.)  Under the substantial evidence standard, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We resolve all evidentiary and credibility conflicts in favor

13

of the verdict and indulge every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.)

A four-year statute of limitations applies to grand theft and securities fraud. (Pen. Code, §§ 801.5, 803, subd. (c)(1) & (3).) The limitations period "does not commence to run until the discovery of an offense . . . ." (Pen. Code, § 803, subd. (c).) "The crucial determination is whether law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud." (*Zamora*, *supra*, 18 Cal.3d at pp. 571-572, italics omitted.) "[I]t is the discovery of the crime, and not just a loss, that triggers the running of the statute." (*Lopez*, *supra*, 52 Cal.App.4th at p. 246, fn. 4.) The inquiry as to the discovery of the offense is a question of fact for the jury to decide. (*Zamora*, *supra*, at p. 565.) On appeal, a jury's findings on the discovery issue are tested under the substantial evidence standard. (*Ibid.*) Where a defendant occupies a position of trust " 'facts which would ordinarily require investigation may not excite suspicion.' " (*People v. Crossman* (1989) 210 Cal.App.3d 476, 482.)

C. Analysis

Bovensiep contends his conviction on two securities fraud charges involving the Kneeshaws and eight grand theft counts involving Dixon, the Kneeshaws, Semeit, Miller and Stevens must be reversed because the four-year limitations period expired before the prosecution commenced for these offenses. The jury disagreed that the limitations period had expired, impliedly finding these individuals did not know they were victims of a

14

crime before February 13, 2009. As we shall explain, substantial evidence supported this implied finding as to each victim.

As a preliminary matter, Bovensiep asserts each of the above victims should have known that a crime had potentially occurred before February 13, 2009, based on the bounced checks, property foreclosures and his failure to respond to their inquiries. Bovensiep asserts that had the victims investigated, they would have discovered additional facts requiring further inquiry. Even assuming, however, that each victim had done some investigation, the testimony of Bovensiep's own expert suggested such an investigation would not have led the victims to believe a crime had been committed.

Janet McHard, a certified fraud examiner for the defense reconstructed the accounting records for Bovensiep's companies for five different bank accounts, entering every transaction into an accounting program. McHard described this as a tedious process that took at least two months. McHard ultimately formed the opinion that there were no signs of fraud. Specifically, she found no evidence of deception or misrepresentation of facts in contemporaneous documents and no false or altered documents. While McHard agreed with the prosecution's definition of a Ponzi scheme, she did not find such a scheme in this case. McHard found evidence of a "procurement violation," meaning money was taken from accounts without permission. While McHard admitted this could be fraud, she stated it could also be improper training or forgetfulness. McHard admitted there were "frequent" bounced checks, but stated that a bounced check "in and of itself, is not a hallmark of fraud." She also stated that losing property to foreclosure is not a red flag for fraud.

15

Accordingly, there was sufficient evidence for the jury to reject Bovensiep's argument that the exercise of reasonable diligence would have led each victim to discover his crimes before February 13, 2009.

**Ronald Dixon – Count 1**

Dixon and Bovensiep became friends and started a business relationship, with Bovensiep helping Dixon sell two parcels of property. Dixon was "extremely satisfied" with Bovensiep's services. Dixon had a high impression of Bovensiep because Bovensiep associated with people who Dixon thought of highly. Dixon trusted Bovensiep as he knew Bovensiep was a past peace officer who attended church and had real estate knowledge.

In late 2004 or 2005, Bovensiep mentioned a Hawaii condominium investment opportunity to Dixon. Dixon decided to invest after meeting Craig Knudsen, Bovensiep's pastor. Dixon felt comfortable joining a partnership with Knudsen and Bovensiep as they were both Christians, he was a Christian and they appeared very honest and reliable.

Dixon purchased an interest in the 835 property for a total of $117,578 in June 2005. Dixon knew that the operating agreement for the condominium limited Bovensiep, as the managing partner, to not exceed $1500 in expenses without approval of all three partners. When Dixon purchased his interest, the 835 property had about $81,000 in assets.

In late 2005, Dixon received some documents showing the LLC had only about $500 or $600 in cash. This concerned Dixon. Dixon send some e-mails to Bovensiep about the issue but never got a response. Dixon believed that Bovensiep had "some

16

explaining to do" regarding depletion of the cash account.  When Dixon never got a response from Bovensiep, he contacted Daniel Tobias, the accountant for the LLC, and asked where the money had gone.  Tobias referred Dixon back to Bovensiep, telling Dixon that he just reports what he is given.  When Bovensiep did not respond, Dixon went back to Tobias.

Tobias told Dixon that there had been a "loan to buyers" that added up to around $65,000.  Dixon was "shocked" because Bovensiep was limited to $1,500 for expenditures and there had been no approval from the other partners for this loan.  Dixon did not understand what the term "loans to buyers" meant because he was unaware of the LLC loaning money to anybody.  Dixon was "concerned" when he learned about the loan because he was unaware of any buyers and had not authorized the expenditure.  Dixon asked Bovensiep for an explanation, but never received one.

On December 9, 2008, Dixon e-mailed a list of 15 questions to Bovensiep after reviewing the financial statements for the 835 property from May 2005 to December 2007.  The first question asked Bovensiep for an explanation regarding the depleted cash assets.  In another question, Dixon asked about a write-off for a bad debt, wanting to know about the debt, stating "This smells of embezzlement and I demand a full disclosure."

Bovensiep e-mailed a response on December 17, 2008, but Dixon could not recall if Bovensiep had completely answered his questions.  Bovensiep ended the e-mail with "good news" including that rates were dropping and this would enable him to refinance a bunch of loans.  Dixon e-mailed a response to Bovensiep's answer that same day,

17

thanking Bovensiep for the update. When asked whether Bovensiep had done a good job in keeping Dixon informed up to this point, Dixon responded "Not totally." Around December 21, 2008, Dixon was "[a] little frustrated" with Bovensiep because Bovensiep had not provided full explanations.

This evidence shows that Dixon knew, and was concerned about, the depleted cash reserves for the 835 property since late 2005. Dixon also knew that the unauthorized "loans to buyers" violated a provision in the operating agreement. The jury, however, could have reasonably concluded that Dixon did not have sufficient information that would have led him to discover that Bovensiep had committed a crime. Bovensiep's lack of responsiveness to Dixon's inquires, while frustrating, did not evidence a crime particularly when viewed in conjunction with Dixon's general high impression of Bovensiep and his belief that Bovensiep was honest and reliable.

It was not until Thanksgiving Day 2009, that Dixon was shocked to learn that the 835 property was being foreclosed. On December 2, 2009, Dixon and others met with Bovensiep at a Coco's restaurant. The participants recorded the meeting and the jury listened to the recording. The general tone of the meeting was cordial and not accusatory, with Bovensiep expressing his gratitude on how congenial and gracious everyone has been.

During the meeting, Bovensiep stated they were together to "fix" things, that the past two years have been devastating and he was receiving counseling. Dixon indicated that he did not think Bovensiep was a bad person, that Bovensiep had good intentions and everyone was trying to work with Bovensiep because Dixon knew the current situation in

18

the real estate market. Dixon again expressed his trust in Bovensiep telling him: "We had, we had some serious doubts, and again my paranoia goes when you don't talk to me. I've told you a thousand times, but if you talk to us, we could take that as good news." The meeting closed with Bovensiep telling everyone that he had his "list" and would "get back to you guys" with more information.

Thus, even at this late date, Bovensiep promised to provide more information to ease Dixon's concerns. Dixon believed Bovensiep had "good intentions" and was most concerned about Bovensiep's lack of communication. On these facts, the jury could reasonably conclude that Dixon did not have sufficient information of criminal activity until Dixon was served with a lawsuit regarding the 835 property in February 2009.

**The Kneeshaws - Counts 5, 7-11**

The Kneeshaws were longtime friends of Bovensiep. They knew him as a "great family man" and "church man" who had helped them and their son with their respective homes. Terry had an "overwhelming" amount of trust in Bovensiep. In 2007, the Kneeshaws invested in the Kihei property and entered into three separate loan investments with Bovensiep, supposedly to people in need. When Terry inquired about missed interest payments, Bovensiep told her that the people who had her money were having difficulties, but that her money was safe and she should not worry. Bovensiep preyed on Terry's sympathies, telling her children were in danger of losing their homes or meals.

In 2008, the Kneeshaws made a fourth loan investment that had a due date in July 2011. Although Terry was hesitant to make the last loan because the earlier loans had not

19

been repaid, she still trusted Bovensiep and did not want other people to lose their homes. During this time period, the Kneeshaws received monthly interest payments from Bovensiep on the first loan for about one year.

On December 5, 2009, George learned that the Kihei property was facing foreclosure. George met with the other investors two times, a couple of weeks apart, to discuss the situation and attempt to gather documents about what was owed on the property. The investors realized they had no standing to talk to the bank or the homeowner's association because the Kihei property was not in their names. At the end of December 2009, George reported the matter to the sheriff's department for a potential criminal investigation. Until the day he learned about the foreclosure, George still trusted Bovensiep, never believed Bovensiep would steal from him and believed Bovensiep's reassurances about repayment of the notes.

The jury could have reasonably concluded that the Kneeshaws did not have sufficient information that Bovensiep had committed a crime until the sheriff's office referred the matter to the DA in February 2010.

**Frederick Semeit – Count 12**

Semeit received two notes from Bovensiep with maturity dates in November and October 2008, with the belief that he would be paid interest and would receive his principal back when the notes matured. Bovensiep claims that Semiet's receipt of only one interest payment put him on inquiry notice and with further inquiry he would have discovered that he was the victim of a crime.

20

This argument ignores Semiet's trust in Bovensiep and Bovensiep's constant reassurances that he simply needed more time to get Semiet's money back. Semiet last spoke to Bovensiep for the purpose of inquiring about repayment in 2009, when Bovensiep again told Semiet "Don't worry. I'll pay you back." While the evidence shows Bovensiep failed to repay Semiet, it does not show that Semiet suspected Bovensiep of a crime. Nor does the evidence suggest what further inquiry Semiet could have undertaken to discover Bovensiep's crime after Bovensiep failed to pay on the notes.

**Chris Miller – Count 13**

In April 2008, Miller gave Bovensiep $48,000 to purchase a condominium. Around April 2009, Miller told Bovensiep that he wanted out of the investment as he had yet to receive any paperwork. Bovensiep promised to return Miller's money as soon as Bovensiep got another investor. After 60 days went by, Miller asked Bovensiep for a promissory note, which Bovensiep provided in April 2009, which stated payment was due in 60 days. Bovensiep later replaced that promissory note in June 2009, with another note due in 60 days. In November 2009, Miller knew Bovensiep was lying to him, but after speaking to Bovensiep's wife he "absolutely" believed he would get his money back.

Although Miller testified that Bovensiep had deceived him about the investment from April 2008 to April 2009, Bovensiep promised to return Miller's money and gave Miller two promissory notes. Miller believed that Bovensiep would repay him. A reasonable jury could have concluded that Miller did not discover Bovensiep's theft until Bovensiep failed to pay on the June 2009 promissory note in August 2009. Thus, Miller did not realize he was the victim of a crime until after February 13, 2009.

21

**Robert Stevens – Count 18**

In January 2007, Stevens invested $25,000 with Bovensiep. Stevens knew that Taylor had been doing business with Bovensiep for quite a while and believed Bovensiep to be a good honest person. Stevens received about four monthly interest payments, but then the checks started to bounce. Bovensiep blamed the problem on someone else and told Stevens he would take care of the issue. Bovensiep then stopped sending Stevens any checks. Stevens sent Bovensiep a couple of letters, but got no response. Bovensiep eventually told Stevens that he would repay him from a business deal in Brazil that would be paying Bovensiep a lot of money. Stevens talked to Bovensiep again, who told Stevens that he was still working on the Brazil deal. Bovensiep also told Stevens that he would repay Stevens when the economy improved.

On July 21, 2009, Mullins helped Stevens write Bovensiep a letter, which Stevens signed. In March 2010, Stevens agreed to Bovensiep extending the note for another year. In May 2010, Bovensiep reassured Mullins that the note would stay in effect until he repaid Stevens. Mullins helped Stevens with a second letter in July 2010. In August 2010, Bovensiep again promised to take care of Stevens, but was unclear about the timing.

Bovensiep claims Stevens should have discovered the theft in 2008 when the checks Stevens received bounced. A reasonable jury, however, could have concluded that based on Bovensiep's promises to repay Stevens from the Brazil deal, that Stevens had no reason to suspect Bovensiep until July 2009, when Mullins and Stevens sent their

22

first letter to Bovensiep.  Thus, the jury reasonably concluded that Stevens could not have discovered the theft before February 13, 2009.

Accordingly, substantial evidence supported the jury's implied finding that the statute of limitations had not expired for the challenged counts.

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.

23