Filed 8/2/23  P. v. Rivera CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>GLYNDON ZANONI RIVERA,<br><br>　　Defendant and Appellant. | D080408<br><br><br><br>(Super. Ct. No. SCN347434) |

APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.


A jury convicted Glyndon Zanoni Rivera of 14 counts of sexual abuse of his young stepdaughter, Paola I.  For these crimes, Rivera was sentenced to

state prison for 26 years and eight months to life, plus 15 years to life. Paola reported the abuse many years after it occurred, and the charges against Rivera were filed 19 months after that initial report. On appeal, Rivera argues his due process rights were violated by these delays and that the trial court erred by rejecting his motion to dismiss based on that claim. In the alternative, Rivera contends the trial court erred by not staying the punishments for two of the 14 convictions at issue under Penal Code section 654.[1] As we shall explain, we reject these arguments and affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Prosecution Case*

Maria I. had three children – Paola, Rogelio, and Nathan. Paola was Maria's oldest child and was born in April 1991. Between 1998 and June 2002, Maria lived with her children in a one-bedroom apartment on Grant Street in Oceanside. In 1999, Maria met Rivera walking home from work. The two began a sexual relationship, and their son, Mutsuhito ("Mutsi"), was born in June 2000. Maria and Rivera got married in April 2001, and remained married until 2006. Paola saw Rivera as her stepdad during this time. Although married to Maria, Rivera did not live with the family at the Grant Street apartment, but he spent the night there on occasion.

Throughout the timeframe of the crimes, Maria worked as a cook on weekdays at a daycare from approximately 7:00 a.m. until 3:30 p.m. Before work, Maria took her two older children, Paola and Rogelio, to a babysitter and the sitter would take them to school. Nathan went to the daycare with Maria. In 2002, Maria and the children moved from Grant Street to an

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

apartment on Nevada Street. Following that, the family lived in an apartment on Big Bend Way.

Shortly after Rivera began his relationship with Maria, when Paola was around eight years old, Rivera began to sexually abuse Paola. The abuse ended when she was between 17 and 19 years old. On different occasions, Rivera touched her both over and under her clothing, penetrated her vagina with his hands and penis, orally copulated her, forced her to orally copulate him, touched her buttocks, and took sexually explicit photographs of her. To silence Paola, Rivera repeatedly threatened to kill her and have her mother deported. He also threatened to show family members pictures of her performing sexual acts. When Maria witnessed some of the abuse, Rivera threatened her, claiming he would take her children away and have her deported.

According to Rogelio, when he was seven or eight years old, Rivera would frequently show up at their home while their mother worked, take Paola into another room, and tell him to "wait outside." If Paola refused to go with Rivera, he would grab her. At trial, Paola testified that at the Grant Street apartment there were between 15 and 20 incidents of inappropriate touching by Rivera, three to four incidents of oral copulation by Rivera on Paola, three to four incidents of him forcing her to perform oral sex, two incidents of Rivera penetrating her with his penis, and six incidents of placing his hand on her vagina.

Paola testified that the first incident occurred when Paola was sleeping at the Grant Street apartment, and she woke up with her dress pulled up, and her underwear pulled down. Paola felt something between her legs and Rivera was touching her buttocks. When she asked him what he was doing, he looked at her and got up and left. Paola got dressed and looked for her

3

mother.  She told her mother Rivera had touched her, and recalled that her mother told her to go back to sleep.

On a later occasion, Paola and her brother came home to the Grant Street apartment after school.  Rivera asked Rogelio to go into the bedroom and then forced Paola into the bathroom.  He told her to get undressed and when Rivera entered the bathroom, Paola began screaming and yelling.  She grabbed a bottle of Lysol and sprayed Rivera and scratched his neck, but she was unable to exit the bathroom.  Paola said that Rivera then stripped off her clothing and performed oral sex on her, then placed his penis on her genitals.

Paola recounted another incident that occurred when she was eight years old.  During this attack, Rivera forced Paola onto a bed, then got a knife from the kitchen and held it to her throat.  He told her to stop screaming or he would kill her.  Paola was scared.  Rivera then performed oral sex on her and forced her to perform oral sex on him.  Paola could not remember if Rivera penetrated her vagina during this incident.

Paola next told the jury about an incident at the Grant Street apartment that occurred during the time another family, a mother and son, were renting out the living room of the apartment.  Because of this arrangement, the living room was separated from the rest of the room by a curtain.  During the incident, Rivera asked Paola to take off her clothes, then told her to get into various sexual positions in the area behind the curtain.  Rivera then took off his clothing and performed oral sex on Paola and penetrated her vagina with his penis.  He also forced Paola to perform oral sex on him.  Paola recalled that when Rogelio came home, she called out his name.  Rogelio recalled the incident as well, and both told the jury that Rogelio opened the curtain and saw Rivera and Paola naked in bed, and that

4

Rivera was on top of Paola. Both siblings testified that Rivera told Rogelio nothing was going on and to leave.

Paola testified that when she was between nine and ten years old, another incident occurred during which Rivera showed her a pornographic movie and told her to be "like one of those girls." Rivera then groped her and penetrated her vagina with his penis.

Paola also told the jury about an incident when she was 10 years old. While her mother was in the shower, Rivera began touching her and told her to perform oral sex on him in the kitchen, which she did. Maria was suspicious, and when she got out of the shower she walked into the kitchen and saw Paola performing oral sex on Rivera. Maria yelled at and hit Rivera, who threatened her. Maria told the jury she did not report this incident to the police because she was afraid of losing her children. Rogelio also overheard their mother yelling at Rivera, and told the jury that Rivera told Rogelio that his mother had walked in on Paola performing oral sex on him.

Paola also told the jury about an incident that occurred when the family lived at the Nevada Street apartment. Rivera picked Paola up at the school bus stop, took her to his apartment, told her to get naked, and took Polaroid photos of her lying down naked and performing oral sex. Rivera was also naked and took photographs of his genitals on top of hers. After he ejaculated, he took a photo.

Maria recalled the day of the event and said that when she got home and realized that Paola was not there, she began searching for her. One of Paola's friends told her Rivera had taken Paola to his house. Maria saw Paola running from Rivera's house, which was about four blocks from hers. Paola was crying. Maria later asked Rivera why he had taken Paola. She

could not recall what he said but did remember that he was upset by her questions.

When Paola was between the ages of 14 and 18, the family lived in an apartment on Big Bend Way. During this time, Rivera would come to the apartment to visit his son, Mutsi. Paola testified that at this apartment, Rivera touched her inappropriately while she was clothed.

In 2013, Paola was volunteering at a church when she saw Rivera, whom she hadn't seen in years. This caused Paola to have an anxiety attack. Her boyfriend's mother, Vikki C., asked her questions, and Paola "told her everything." Shortly after, on November 25, 2013, Paola and Vikki went to the Oceanside Police Department and Paola reported the crimes to authorities. Paola, who was upset and crying, spoke to a patrol officer, who wrote a report.

An Oceanside Police detective was assigned the case on December 2, 2013. The detective subsequently interviewed Paola, who remembered many details of the crimes. Paola's mother was also interviewed. The detective later facilitated a recorded call between Paola and Rivera, which was played for the jury. During the call, after Paola told Rivera she needed to talk to him "to get it off [her] chest" and that she had "thought about a lot of things from the past," Rivera told her that he "should be apologizing to you but um, I can't say I wish it was different." When Paola said she had memories of what Rivera did to her, Rivera said he could not talk, and then said she could talk to him in person. When Paola asked Rivera if he remembered putting a knife to her throat, Rivera denied the allegation and suggested Paola was trying to keep him from Mutsi.

The prosecution also introduced expert testimony on child sexual abuse. Christina Schultz, a forensic interviewer with the Palomar Health

Forensic Health Services Child Advocacy Center, provided testimony on generalized concepts related to children who are sexually abused. Schultz opined that it is more common for an abuser to be known to the child than to be a stranger. She stated she was personally aware of situations, like this one, where multiple individuals live in the same household and they are not aware that abuse is occurring to children in the home. "More often than not," parents in such a situation have expressed surprise that abuse has occurred.

Schultz also testified that it is common for a child who is abused to maintain a relationship with their abuser. Further, the majority of child sexual abuse cases involve delayed or incremental disclosure. Schultz explained that a supportive household can play a large role in whether a child will disclose or whether they will recant.

B. *Defense Case*

Rivera presented the testimony of several witnesses who observed his interactions with Paola and her family. Lilia P. rented a room from Maria and her family at the Grant Street apartment. Lilia testified that Rivera's interactions with Maria and her children were "normal" and did not cause her any concern. Teodoro L. was a friend of Rivera's, who lived with Rivera and his brother. Teodoro also worked with Rivera as a sports referee. He met Paola and Maria, and when he saw Rivera with Paola, she did not appear afraid and he observed nothing irregular.

Rivera's niece also testified in his defense and told the jury that the interactions between Rivera and Paola were "friendly," and she did not observe Paola being fearful of him. She never observed anything concerning about their relationship. Rivera's brother and sister testified Paola appeared happy around Rivera; they did not think she seemed fearful and did not

observe any concerning behavior. They both stated that Rivera had a good relationship with Paola.

Rivera took the stand in his own defense. He met Maria in the fall of 1999. They began a sexual relationship and Maria became pregnant. Rivera was in a relationship with another woman at the time. He met Maria's children in early 2000, and their son Mutsi was born in June of that year. After Mutsi was born, Rivera's contact with Maria increased. On weekdays, she would drop the baby off at his house in the mornings and pick him up in the afternoons. When he went to Maria's apartment on Grant Street, he would speak with her father who also lived there. Rivera testified he was never alone at the apartment with Paola or Rogelio.

Rivera testified that in 2001, Maria became "hostile" towards him with regard to the care of Mutsi. He rarely saw Maria or the family during that time. Rivera testified he never went to the Grant Street apartment during the first six months of 2001 and did not have any interaction with Paola. Rivera also stated he rarely went to that apartment because he was concerned about gang violence. He told Maria that she should move, and she did. In 2002 and 2003, he had custody of his son every other weekend. This changed in 2005 and he and Maria began dating again.

Rivera denied the charges against him, testifying that the claims were "absurd." He specifically denied showing Paola pornography and testified that Paola's claim that he picked her up from the bus was false.

3. *Verdict and Sentencing*

After deliberations, the jury returned its verdict finding Rivera guilty of 14 of the 16 charges brought against him: committing a lewd act upon a child under the age of 14 (§ 288, subd. (a); counts 1, 5, 6, 8, 10, 12, 14, 16), forcible lewd act upon a child under age 14 (§ 288, subd. (b)(1); count 2), forcible oral

8

copulation (§ 287, subd. (c)(2)(A); count 3), aggravated sexual assault of a person under the age of 14 (§ 269; count 4), and forcible oral copulation upon a child under age 14 (§ 287, subd. (c)(1); counts 7, 13, 15).[2] The jury also found true additional allegations against Rivera that, as to counts 2, 8, 10, 12, and 14, he had substantial sexual contact with the victim within the meaning of section 1203.066, subdivision (a)(8); as to counts 2 and 3, he used a knife during the commission of the offenses, within the meaning of section 12022.3, subdivision (a); and, as to count 5, he used force, violence, menace, duress, and fear within the meaning of section 1203.066, subdivision (a)(1). The court dismissed count 9, forcible oral copulation upon a child under age 14 (§ 287, subd. (c)(1)), before the jury rendered its verdict, and count 11, sexual penetration by a foreign object (§ 289, subd. (j)), after the jury was unable to reach a verdict on the charge.

Thereafter, in a bifurcated proceeding, the trial court found true sentencing factors that counts 2–5 involved great bodily injury; counts 6–8, 12, and 13 involved a high degree of callousness; and that Rivera took advantage of a position of trust with respect to counts 1–8, 10, 12, and 13. The court then sentenced Rivera to 26 years and eight months, plus 15 years to life in state prison. The sentence consists of 15 years to life on count 4, plus eight years on count 5, plus two years each for counts 1, 6, 7, 8, 10, and 12 through 15, and an additional eight months for count 16. Rivera timely appealed the judgment of conviction.

---

[2] The information filed against Rivera alleged count 1 occurred between April 30, 1999 and April 29, 2000, counts 2 through 7 occurred between April 30, 1999 and April 29, 2001, counts 8 thorough 13 occurred between April 30, 2001 and April 29, 2002, counts 14 and 15 occurred between April 30, 2002 and April 29, 2003, and count 16 occurred between April 30, 2005 and April 29, 2006.

DISCUSSION

I

Rivera asserts the trial court erred by denying his motion to dismiss based on his contention that his due process rights were violated by the seven- to thirteen-year delay between the occurrence of the crimes and Paola's reporting of the crimes to law enforcement. For the first time on appeal, Rivera also contends the 19-month delay between Paola's reporting to law enforcement and the filing of the felony complaint against him also violated his due process rights. The Attorney General responds that the trial court's denial of the motion was not error because the delay was not the result of the government's actions and because substantial evidence supported the court's finding that Rivera was not prejudiced by the delay.

A

*Additional Background*

As discussed, the charged crimes were alleged to have occurred between April 30, 1999 and April 29, 2006. Paola first reported the crimes to law enforcement on November 25, 2013, and the initial felony complaint was filed a little more than 19 months later, on July 9, 2015. Rivera moved to dismiss the charges before trial, asserting his due process rights were violated by the pre-complaint delay. Rivera argued that both Paola and her mother were aware of the crimes against Paola but they did not report the wrongful conduct to police. Rivera asserted that had they done so in a timely manner, he would have had "an abundance of evidence and witnesses to prove the falsity of" the charged crimes. Rivera submitted a declaration in support of the motion and various exhibits. Rivera later filed a supplemental brief in support of the motion, as well as additional declarations.

The prosecution filed an opposition to Rivera's motion, arguing the motion was premature and should be addressed following trial. The prosecution further argued no due process violation had occurred because the delay was not attributed to the State, but rather, was caused by Rivera's own threats against Paola and her mother. The prosecution further asserted that any alleged prejudice was purely speculative.

The court conducted three sessions of evidentiary hearings on the motion before trial. At the hearings, Rivera testified about the various witnesses he believed would be helpful to his defense, but that could not be located. He stated that one of Maria's coworkers at the daycare would have testified that "everything seemed normal" with the family, and Paola had no fear during Rivera's interactions with her. Rivera also stated a neighbor, known as the "Alo Vera Lady," would have testified that he did not live at the Grant Street apartment, and that Rivera was never alone with Paola.

Similarly, Rivera testified Maria's father could also have testified that he never observed Rivera alone with the children, never observed "anything strange," and never witnessed sexual misconduct. Rivera also claimed Maria's cousins and sister would have testified his relationship with the family, including Paola, was normal. Rivera told the court his friends would have testified about his positive interactions with Paola, and about Paola's drug use. Rivera said two former roommates from Japan, his former piano teacher, and several additional friends and acquaintances could have testified about their observations that the family was happy and that interactions they observed between Rivera and Paola were positive.

Rivera also provided testimony from a private investigator hired by his counsel regarding her inability to locate several witnesses whom Rivera claimed would be helpful to his defense. Finally, a friend of Rivera's testified

11

he could not recall when he first met Rivera or anything about Paola, or the rest of Rivera's family, due to the passage of time. After the evidentiary hearings, the trial court deferred ruling on the motion to dismiss until after trial.

After the jury rendered its verdict, the trial court heard additional argument by counsel on Rivera's motion to dismiss. The court then denied the motion. The trial court observed it was undisputed that Paola did not report the sexual abuse until seven and a half years after the last alleged incident and 14 and a half years from the first alleged incident. It concluded that because the delay was not caused by government conduct, there was no due process violation.

The trial court then found that Paola reported the abuse "well within" the statute of limitations and "well within the time frame the legislature has determined was necessary for a victim of childhood sexual abuse to have the psychological strength to confront their abuser." Further, the court found that basing a due process violation on a child victim's delay in disclosing the abuse "is directly in conflict with the legislative determination that such a victim's fair opportunity to report the crime, because they did not have the psychological strength to confront their abuser, does not run out until they are 28, now 40 ...."

Likewise, the court found Maria's failure to disclose her daughter's abuse could not form the basis for a due process claim because it "would ignore the legislature's and the courts' recognition that there are numerous psychological reasons as to why a parent might not report the abuse to police, would ignore the legislative determination that the time in which to report such crimes is determined by the victim's ability to report the crimes, not a parent's, and would be contrary to the legislative intent to not allow an

12

abuser to be insulated from prosecution because of the unique dynamics of childhood sexual abuse ....”

The trial court then stated that despite its finding Rivera's due process rights were not implicated by Paola's delayed reporting of the abuse, out of an abundance of caution it would consider whether Rivera had been prejudiced by the delay. The court found Rivera had not suffered prejudice, noting that Rivera's contention that the loss of Paola's medical records contemporaneous in time to the alleged incidents was not prejudicial because it was undisputed the sexual abuse was never reported to medical providers and the lack of such evidence also harmed the prosecution. The court found that Rivera's contention that the loss of school records harmed his case because the records would have showed Paola's demeanor was inconsistent with a child who was being molested was also speculative, and it was undisputed that Paola never reported sexual abuse to school personnel. Additionally, Rivera's assertion he was prejudiced by the loss of records concerning school bus routes and Maria's timecards from work was not well-founded because those items were irrelevant.

The trial court also found Rivera failed to show he was prejudiced by his inability to locate various witnesses because the potential witnesses he identified were either not crucial, or other witnesses testified on the same topics. The court noted there was no dispute that Paola had positive interactions with Rivera, and Rivera presented the testimony of five witnesses who observed "positive or normal interactions" between them. Additionally, Rivera's own trial testimony, which downplayed his interactions with Paola, undermined the claimed significance of the absent witnesses' observations. The court found there was "no to minimal, at best, prejudice" arising from Rivera's inability to locate witnesses and the lost memory of

those witnesses that did testify.  The court concluded that, "based upon the strong societal justification for allowing delay in reporting crimes of childhood sexual abuse to law enforcement and the lack of, or at best minimal, prejudice to [Rivera] from delay," there was no violation of Rivera's due process rights.

## B

### *Legal Principals*

"A defendant's state and federal constitutional speedy trial rights (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 1) do not attach before the defendant is arrested or a charging document has been filed.  (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).)  Nonetheless, a defendant is not without recourse if a delay in filing charges is prejudicial and unjustified.  The statute of limitations is usually considered the primary guarantee against overly stale criminal charges [citation], but the right of due process provides additional protection, safeguarding a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence (*Nelson*, at p. 1250)." (*People v. Abel* (2012) 53 Cal.4th 891, 908 (*Abel*).)

"A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time.  [Citation.]  Prejudice to a defendant from precharging delay is not presumed.  [Citations.]  In addition, although 'under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process.  ...  If the delay was merely negligent, a greater showing of prejudice would be required to

14

establish a due process violation.' (*Nelson,* [*supra*, 43 Cal.4th] at pp. 1255–1256.)  If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay. ([*Id.*] at p. 1250.)  But if the defendant fails to meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified." (*Abel, supra,* 53 Cal.4th at pp. 908–909.)

In balancing harm to the defendant against the justification for the delay, the trial court's task is to determine whether that delay violates the fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency.  (*People v. New* (2008) 163 Cal.App.4th 442, 460.)  In other words, the court must decide whether the delay tilted the playing field in such a way that it prevented the defendant from receiving a fair trial.  (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 914–915 (*Dunn-Gonzalez*).)

We review the trial court's ruling on a motion to dismiss for precharging delay for abuse of discretion, and defer to any underlying factual findings if substantial evidence supports them.  (*People v. Cowan* (2010) 50 Cal.4th 401, 431.)  " 'Under the abuse of discretion standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Jones* (2013) 57 Cal.4th 899, 924.)

C

*Analysis*

Rivera first asserts that the trial court erred by concluding the victim's delay in reporting the abuse did not implicate his due process rights.  Rivera

15

also argues that the denial of his motion to dismiss was error because the court failed to consider the 19-month delay between the time Paola reported the abuse and the filing of the criminal complaint, and because the court relied on "societal justifications" rather than the justification proffered by the prosecution. Finally, Rivera argues that the court used a prejudice standard that was too high, which "led to an erroneous balancing analysis" and finding of minimal to no prejudice.

As an initial matter, we reject Rivera's assertion that the court erred by finding his due process rights were not implicated by the victim's delay in reporting the crimes. As the Attorney General points out, Rivera concedes no reported California cases have found due process violations where the delay is not attributable to the government.[3] Rivera instead relies on a Tennessee Supreme Court case, *State v. Gray* (Tenn. 1996) 917 S.W.2d 668 (*Gray*), that concluded the defendant's due process rights were violated where the victim came forward 42 years after her uncle sexually abused her as a child.

*Gray*, however, does not reflect the California standard for precharging delay, which requires the defendant to first show prejudice before the court considers whether the delay is justified. Rather, the *Gray* court held that to determine if the defendant's due process rights are violated the court "must consider the length of the delay, the reason for the delay, and the degree of

---

[3] As the parties point out, one Court of Appeal opinion, *People v. Lewis* (2015) 234 Cal.App.4th 203 (*Lewis*), "assume[d] for purposes of ... analysis that due process can be denied by a delayed prosecution even if the state is not responsible for the delay," but rejected the defendant's claim. (*Id.* at p. 212.) Similar to Rivera, the defendant argued the victim's delayed reporting (by 17 years) of sexual abuse that occurred when she was a child constituted a violation of his due process rights. The court held the delay was fully justified (like here, the defendant threatened the child victim with death if she told anyone) and that the defendant failed to show any prejudice. (*Id.* at p. 213.)

prejudice, if any, to the accused." (*Gray, supra*, 917 S.W.2d at p. 673.) Additionally, the delay at issue in *Gray* was significantly longer than that here. The reported abuse occurred 42 years before the victim came forward, and the *Gray* court found she had no reasonable justification for that delay. (*Id*. at pp. 673–674.) In contrast, Paola reported the abuse seven years after it ended and testified that she did not come forward as a child because Rivera repeatedly threatened to kill her, have her mother deported, or show the compromising photographs he took of her to others. These facts are far different from those in *Gray*. We reject Rivera's assertion that the case supports reversal here.

Even assuming for purposes of argument, as the trial court did, that Paola's delay in coming forward could form the basis for a violation of Rivera's due process rights, we agree with the court that Rivera showed at best minimal prejudice that did not outweigh Paola's justification for the delay. He argues he was unable to obtain documentary records concerning Paola's medical care and school performance, or Maria's employment records. But, as the trial court pointed out, there was no dispute that the abuse was not reported to medical providers or school personnel. In addition, the assertion that any particular behavior shows a lack of abuse is entirely speculative. Further, several witnesses testified that Paola's demeanor at the time of the abuse was not suggestive of a problem. Thus, the lack of the documentation Rivera says was lost due to the passage of time was, as the trial court found, minimally or not at all prejudicial.

Rivera also argues he was unable to obtain the testimony of a multitude of witnesses who either could not be located, could not remember the relevant time frame, or who died prior to the proceedings. He argues these witnesses would have provided testimony that his interactions with the

17

victim were positive and, as with the missing documents, would support his theory that Paola, Rogelio, and Maria were lying. However, five witnesses testified that Rivera and Paola were often observed peaceably together and it was not disputed that the abuse was hidden from others, minimizing the relevance of such testimony. In addition, the testimony that these purported witnesses would have provided was entirely speculative. "Our Supreme Court has repeatedly found [such] speculative arguments inadequate to establish the actual prejudice required for delayed prosecution to constitute a due process violation." (*Lewis, supra,* 234 Cal.App.4th at p. 213.)

In sum, the trial court's determination that the prejudice suffered by Rivera was minimal, at most, was supported by the record before the court. On the other side of the balancing equation, the trial court appropriately determined that Paola's delay in coming forward was justified by Rivera's threats against Paola and her mother to keep the abuse quiet. In this case, "the delay in prosecution was completely justified and the possible prejudice was [almost] entirely speculative ...." (*Lewis, supra*, 234 Cal.App.4th at p. 213.) Accordingly, the trial court did not abuse its discretion by finding "the justification for delay outweighed the possible harm and the motion to dismiss for deprivation of due process was correctly denied." (*Ibid*.)

Finally, Rivera's claim that the trial court erred by failing to account for the 19-month delay between the time Paola reported the abuse to law enforcement and the filing of the criminal complaint also lacks merit. Importantly, despite his contrary assertion on appeal, Rivera did not base his motion to dismiss the case on this post-reporting delay. Rather, his motion and the proceedings on the motion focused exclusively on Paola's delay in reporting the crimes to police. Rivera made no argument and provided no evidence concerning the alleged charging delay. Consideration of this new

18

argument on appeal is not appropriate. (See *People v. Borland* (1996) 50 Cal.App.4th 124, 129 ["It is well established that a party may not change his theory of the case for the first time on appeal."]; see also *Nelson, supra*, 43 Cal.4th at p. 1250 ["A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay."].)

Even if we were to reach this argument, Rivera has not shown reversal on this basis is required. The record shows the matter was assigned to a detective within the same week that Paola reported the abuse to the Oceanside Police Department. Two months later, the police conducted the recorded call between Paola and Rivera. The record contains no other evidence on the matter. This "court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. '... Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay ....' " (… *Nelson, supra*, 43 Cal.4th at pp. 1256–1257.) "For the same reason, the difficulty in allocating scarce investigative resources provides a valid justification for delay." (*Abel, supra,* 53 Cal.4th at p. 911; see also *Dunn-Gonzalez, supra*, 47 Cal.App.4th at pp. 914–915 ["Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused because investigative delay is not so one-sided. A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of orderly expedition to that of

19

mere speed."].)  Rivera has not met his burden to show the delay in filing charges after Paola came forward was negligent or intentional.

Lastly, Rivera contends the trial court erred by finding he was not prejudiced by the reporting delay because the court required a "heightened showing of prejudice" based on "societal justifications, rather than the prosecution's justifications."  The record, however, shows the court conducted a proper balancing of the justifications for the delay—informed by the Legislature's determination to create long statutes of limitations for crimes involving the sexual abuse of children—and the alleged prejudices suffered by Rivera.  To the benefit of this court and the parties, the trial court provided a thorough explanation of its ruling, accurately setting forth the legal standard and meticulously reviewing and rejecting the prejudices Rivera contends he suffered.  The denial of Rivera's motion was not error.

## II

In an alternative claim, Rivera asserts the trial court erred by failing to stay the sentences it imposed for certain counts under section 654. Specifically, he argues that counts 12 and 13 were based on the same course of conduct, and thus subject to one punishment, and counts 14 and 15 also concerned just one course of conduct.  The Attorney General responds that the evidence supported the trial court's determination that the counts all involved separately punishable conduct.  We agree with the Attorney General.

## A

### Additional Background

Count 12 of the criminal complaint charged Rivera with committing a lewd act upon a child under the age of 14 (§ 288, subd. (a)) and count 13 charged forcible oral copulation upon a child under age 14 (§ 287,

subd. (c)(1)).  These charges arose from the incident in the kitchen when Paola was 10 years old.  Paola testified that while her mother was in the shower, Rivera began touching her.  She stated Rivera also told her to orally copulate him, which she did.  Paola's mother walked in and observed what was happening and began yelling at and hitting Rivera.

Count 14 of the criminal complaint charged Rivera with committing a lewd act upon a child under the age of 14 (§ 288, subd. (a)) and count 15 charged him with forcible oral copulation upon a child under age 14 (§ 287, subd. (c)(1)).  The evidence as to these two counts showed that while Paola was living at the Nevada Street apartment, Rivera picked her up at the school bus stop, took her to his apartment, told her to get naked, and took Polaroid photos of her lying down naked and performing oral sex.  Rivera was also naked during this photoshoot.  He also took photographs of his genitals on top of hers.  After he ejaculated, he took a photo.

Prior to sentencing, Rivera filed a sentencing brief arguing section 654 applied to counts 12 and 13 and to counts 14 and 15.  The prosecutor filed a statement in aggravation arguing that Rivera should receive consecutive sentences as to counts 12 and 13 and counts 14 and 15 because the charged acts were separate and distinct, and therefore section 654 was inapplicable. The prosecutor noted that count 12 involved touching the victim's chest and count 13 involved oral copulation.  While count 14 concerned the Polaroid incident in which Rivera touched Paola's body with his penis, and count 15 involved the separate act of oral copulation.

At sentencing, the trial court found section 654 did not apply to count 13 because "although this is the same incident as Count 12, it involved a different sex act and was a separate and distinct act other than Count 12. It was not committed as a means of committing, facilitating or incidental to

21

count 12." Similarly, the court found section 654 was not applicable with regard to counts 14 and 15, stating that "although [count 15] is the same incident as [c]ount 14, it involved a different sex act and was separate and distinct from the act in [c]ount 14. It was not committed as a means of committing, facilitating, or incidental to committing [c]ount 14."

## B

### *Legal Standard*

Section 654 generally prohibits the imposition of multiple punishments for offenses arising out of a single act or indivisible course of conduct. (§ 654, subd. (a); *People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) A course of conduct divisible in time, even if directed to one objective, may also give rise to multiple punishments. (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.)

"However, the rule is different in sex crime cases. Even where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006 (*Alvarez*).) "[S]ection 654 does not apply to sexual misconduct that is 'preparatory' in the general sense that it is designed to sexually arouse the perpetrator or the victim. [Citation.] That makes section 654 of limited utility to defendants who commit multiple sex crimes against a single victim on a single occasion. As our Supreme Court has stated, '[M]ultiple sex acts committed on a single occasion can result in multiple statutory violations.

22

Such offenses are generally "divisible" from one another under section 654, and separate punishment is usually allowed. [Citations.]' [Citation.] If the rule were otherwise, 'the clever molester could violate his victim in numerous lewd ways, safe in the knowledge that he could not be convicted and punished for every act.' [Citation.] Particularly with regard to underage victims, it is inconceivable the Legislature would have intended this result." (*Ibid*.)

Whether section 654 applies in a case is a question of fact for the trial court, which is vested with broad latitude in making its determination. (*People v. Vang* (2010) 184 Cal.App.4th 912, 915–916.) The trial court's ruling will not be reversed if there is any substantial evidence to support it. (*Id*. at p. 916.) " 'We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' " (*Ibid*.)

C

*Analysis*

With respect to the crimes that occurred in the kitchen when Paola was around 10, Rivera argues that his lewd touching was part of one course of conduct to facilitate oral sex. Similarly, with respect to the Polaroid incidents, Rivera argues the evidence he touched his penis to Paola's body reflects no separate intent other than to facilitate oral copulation. However, the fact that one lewd act precedes other lewd acts does not establish that the first is merely incidental to or facilitative of the later acts and thus subject to section 654. (*People v. Madera* (1991) 231 Cal.App.3d 845, 855.)

Here, the evidence reasonably supports the trial court's conclusion that Rivera's act of groping Paola in the kitchen was not necessary for oral copulation. Likewise, the act of placing his penis on her vagina and taking photographs was not necessary for the oral copulation that also occurred

23

during the incident.  Because there is no evidence that these acts were necessary to enable Rivera to facilitate oral copulation with Paola on the two occasions, the acts are reasonably interpreted as done for the separate purpose of Rivera's arousal.  Thus, the trial court reasonably concluded that Rivera's distinct acts of touching Paola in the kitchen and of placing his penis on her in the Polaroid incident were separately punishable under section 654 and not "merely designed to facilitate the subsequent acts of" oral copulation. (*Alvarez, supra*, 178 Cal.App.4th at p. 1007; see also *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340 [in absence of circumstance foreclosing trial court's sentencing discretion, i.e., where specific factual basis for jury's conviction can be identified, court may base its sentencing decision under section 654 on any facts in evidence at trial, without regard to verdicts].) Thus, substantial evidence supports the trial court's finding that the acts in counts 12 and 14 involved distinct sexual objectives from the oral copulation charged in counts 13 and 15.

## DISPOSITION

The judgment of conviction is affirmed.


McCONNELL, P. J.

WE CONCUR:


KELETY, J.


CASTILLO, J.

24